**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| JERRY FALWELL, JR., INDIVIDUALLY AND IN HIS CAPACITY AS BENEFICIARY OF THE DR. JERRY L. FALWELL FAMILY TRUST,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>LIBERTY UNIVERSITY,<br>JERRY PREVO,<br>AND JONATHAN P. FALWELL,<br><br>　　　　　Defendants. | Case No. 6:23-cv-00040-NKM<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff, Jerry Falwell, Jr., individually and in his capacity as a beneficiary of the Dr. Jerry L. Falwell Family Trust ("Mr. Falwell" or "Plaintiff"), as and for his Amended Complaint against Defendants, Liberty University ("Liberty" or the "University"), Jerry Prevo, and Jonathan P. Falwell, hereby alleges as follows:

## INTRODUCTION

1.	This is an action arising from Liberty University's unauthorized exploitation of the JERRY FALWELL trademark and the name, picture, and/or portrait (together "name or image") of Jerry Falwell in advertising and promoting Liberty University, without consulting with the Falwell family and without the authorization of the Dr. Jerry L. Falwell Family Trust (the "Trust" or the "Falwell Family Trust").

2.	For more than fifty years, the distinctive JERRY FALWELL trademark has stood as a nationally recognizable symbol for the late Dr. Jerry L. Falwell's brand of religious goods and

services.  Upon his passing in 2007, Dr. Falwell left his valuable JERRY FALWELL trademark in a trust for the benefit of his three children.

3.     The JERRY FALWELL trademark, and the Jerry Falwell name and image (together "Falwell IP") do not belong to Liberty.  Rather, as Liberty has acknowledged in a written agreement, the Trust and its beneficiaries have the exclusive right to control the use of the JERRY FALWELL trademark in commerce so as to prevent confusion among consumers and to protect the immense goodwill and reputational value in the JERRY FALWELL brand.

4.     There are numerous good reasons for the JERRY FALWELL brand to not want to be perceived as having endorsed or sponsored Liberty, at least as it exists in its current incarnation, under the control of a small group of members of the so-called "Executive Committee" who have seized control of the University after Mr. Falwell's resignation as President and Chancellor of the University in August 2020.  For instance, as detailed herein, Mr. Falwell has learned that Liberty has made payments totaling over a million dollars in purported "donations" to organizations that are, upon information and belief, under the control of certain members of Liberty's Board of Trustees and its Executive Committee, or their close associates.

5.     These apparent self-dealing transactions have the appearance of kickbacks and are directly at odds with the JERRY FALWELL brand.  During his lifetime, Dr. Falwell earned a reputation as a major proponent of financial integrity in religious and educational institutions and led the way in restoring public trust and confidence in such institutions after financial scandals associated with other, unrelated church leaders rocked the evangelical community in the 1980s. The JERRY FALWELL brand will not be associated with such conduct.

6.     Liberty's treatment of the Falwell family, at the direction of the Executive Committee, is also anathema to the JERRY FALWELL brand.  During his lifetime, Dr. Falwell

valued the importance of forgiveness in Christianity. But when, in the run-up to Mr. Falwell's resignation, news broke that his wife, several years earlier, had an extramarital affair, members of the Board of Trustees and its Executive Committee used it as an opportunity to elevate their own positions of power within Liberty, for their own gain, and treated the Falwells in abhorrent fashion, including by seeking to temporarily oust Mr. Falwell when his health was failing by exaggerating his alcohol use when, in reality, Mr. Falwell was suffering from a nearly-fatal genetic lung condition; and then seeking to force Mr. Falwell's resignation when the news of his wife's affair broke, despite the fact that Mr. Falwell himself did not have an affair, in contrast to several high-ranking University officials (including a former President, a former Dean, a former Provost, and a current Executive Committee member) who the Board of Trustees or Executive Committee believed had affairs or related misconduct but, consistent with Dr. Falwell's belief in forgiveness, were embraced by Liberty. Once Mr. Falwell was gone, Liberty dug in and continued to treat the Falwells in an ugly manner inconsistent with the principles and values associated with the JERRY FALWELL brand. This included, among other things, banning the Falwells from campus grounds (where Dr. Falwell — Mr. Falwell's father — is interred); "photoshopping" them out of pictures; taking down photos of the Falwells that had been long-displayed on campus; harassing Mr. Falwell through meritless litigation, and depriving Mr. Falwell of retirement funds. The JERRY FALWELL brand does not stand for such abhorrent treatment, which is antithetical to the reputation by which it is known.

7.      The Executive Committee also has steered Liberty off course. Whereas Dr. Falwell envisioned a major Christian evangelical university with the bona fides of an institution like the University of Notre Dame, the Executive Committee, upon information and belief, adheres to a vision in the tradition of a church-affiliated faith-based college. To that end, Liberty has removed

and/or forced-out several highly-qualified staff, faculty, and vendors, merely because they were perceived to be close to Mr. Falwell, and, in some cases, based on pretext, such as the individual's refusal to abstain from drinking — despite the fact that no rule of Liberty prohibited staff or its 100,000 plus online students from drinking and any rules prohibiting faculty from drinking had not been enforced for decades at the direction of the late Dr. Falwell, and despite the fact that Dr. Falwell himself knowingly recruited individuals to work at Liberty who were not teetotalers.  This vision of Liberty — in which personal politics are placed over academic prowess—is inconsistent with the standards of quality in religious education for which the JERRY FALWELL brand is known.

8.     Notwithstanding that it is damaging to the JERRY FALWELL brand to be perceived as endorsing or sponsoring Liberty University in its current incarnation, Liberty has recently begun to misappropriate the Trust's valuable trademark — and the Jerry Falwell name and Dr. Falwell's image — for itself for use in commerce.  The University has done so in bad faith and with the intent to confuse consumers into wrongly believing that Liberty is endorsed or sponsored by, or otherwise associated or affiliated with, the JERRY FALWELL brand and the Falwell Family Trust.  Upon information and belief, Liberty's acts of large-scale infringement have been personally directed by defendant Jerry Prevo, who served as President of the University on an interim basis after Mr. Falwell's resignation in August 2020.  Having severed Liberty's link in Mr. Falwell to the Trust and its valuable Falwell IP, Liberty set about to claim the Trust's valuable Falwell IP for itself and in a manner that is highly damaging to the immense goodwill and reputational value in the JERRY FALWELL brand.

9.     Thus, commencing by no later than October 2021, the University executed a wide-ranging campaign to cause confusion among consumers of higher education.  Indeed, Liberty has

misused not only Dr. Falwell's name, image, and trademark, but has also taken Dr. Falwell's own handwriting to create a custom font for Liberty to use in advertising (including a magazine cover); has created footprint engravings from a pair of Dr. Falwell's shoes to adorn a JERRY FALWELL walking tour path on its campus; and has presented the public with renderings of a "Jerry Falwell" hologram meant to be a walking, talking, interactive version of Dr. Falwell.  Upon information and belief, Liberty has purposefully undertaken such activities in order to create a false association with the JERRY FALWELL brand and the Falwell Family Trust.

10.    Liberty has also wrongfully exploited the JERRY FALWELL trademark in advertising its plans to open the JERRY FALWELL CENTER as a new welcome center for future students that will be used to promote the University.  Renderings of the center show the JERRY FALWELL trademark prominently fixed on the building's exterior using Dr. Falwell's own handwritten signature.  Both the name of the center, and the use of Dr. Falwell's signature in depicting the JERRY FALWELL mark on its exterior, lead consumers to wrongly believe that Liberty's use of the JERRY FALWELL trademark and name is authorized.  Upon information and belief, Liberty intends to use the JERRY FALWELL CENTER to make even further extensive use of both the JERRY FALWELL trademark and Dr. Falwell's name and image—including the aforementioned "hologram," to further cement a false association with the JERRY FALWELL brand in the minds of consumers.  While Liberty has paid some superficial lip-service to honoring Dr. Falwell's legacy, in both private and public statements, the University has revealed that it plans to use the JERRY FALWELL CENTER primarily as promotion *for Liberty University* and for the purpose of attracting students to enroll at Liberty.  Upon information and belief, through both the JERRY FALWELL CENTER as well as its advertising and promotion for the center, Liberty intends to confuse consumers into believing that Liberty — including its JERRY FALWELL

CENTER — is endorsed or sponsored by, or otherwise associated or affiliated with, the JERRY FALWELL brand and the Falwell Family Trust.  **It is not.**

11.     In fact, Liberty never consulted with — let alone sought the approval of — the Falwell family before embarking on an apparent campaign to wrap itself in the JERRY FALWELL trademark and the Jerry Falwell name and image.  Nonetheless, Mr. Falwell sought to avoid filing this lawsuit, but Liberty has refused to cooperate.  Thus, Liberty left him no option but to initiate this action to protect the valuable Falwell IP from damage.

## THE PARTIES

12.     Mr. Falwell is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell is the son and next of kin of the late Dr. Jerry L. Falwell.  Upon Dr. Falwell's passing in 2007, Mr. Falwell became a co-trustee of the Dr. Jerry L. Falwell Family Trust, a role in which he continued to serve at the time this action was initiated.  Mr. Falwell is also a beneficiary of the Trust.  Consistent with the terms of Dr. Falwell's Will, and by operation of law, Mr. Falwell is entitled immediately to his share of the Trust's assets.

13.     Liberty is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

14.     Defendant, Jerry Prevo, serves as a member of the Board of Trustees of Liberty and its Executive Committee, as well as President Emeritus of the University.  From late 2020 to early 2023, Mr. Prevo served as President of the University on an interim basis.  Upon information and belief, Mr. Prevo is a resident and citizen of Alaska, and regularly transacts business in Virginia as part of his role with Liberty.

15.     Defendant Jonathan Falwell (or "Jonathan") is a citizen and resident of Virginia. He currently resides in Bedford County, Virginia.  He is a trustee of the Trust and, together with Mr. Falwell and their sister Jeannie, one of three beneficiaries of the Trust.[1]

## JURISDICTION AND VENUE

16.     This action arises in part under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*.  This Court has federal question jurisdiction over these claims pursuant to 15 U.S.C. §§ 1121 and 28 U.S.C. §§ 1331, 1338(a) & (b).

17.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), in that the facts underlying the state law claims are so related to the trademark claims that they form part of the same case or controversy under Article III of the United States Constitution.

18.     Personal jurisdiction exists over Defendant Liberty because it is headquartered in and has its principal place of business in Virginia.

19.     Personal jurisdiction exists over Defendant Jonathan Falwell because he is a citizen and resident of Virginia.

20.     Personal jurisdiction exists over Defendant Jerry Prevo because he regularly transacts business in Virginia as part of his role with Liberty and because, upon information and belief, he personally directed acts of infringement alleged herein from within Virginia and personally participated in acts of infringement from within Virginia.

---

[1] As detailed herein, Mr. Falwell has filed a petition to disqualify Jonathan from serving as a co-trustee with respect to Liberty's use of the JERRY FALWELL trademark with the Circuit Court for the City of Lynchburg.

21.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendants Liberty and Jonathan reside in this district.

## FACTUAL BACKGROUND

### A. Dr. Falwell and the JERRY FALWELL Trademark

22.     For more than fifty years, the JERRY FALWELL trademark has been recognized by consumers as designating Dr. Falwell's brand of religious goods and services.  Dr. Falwell initially built his brand through sermon delivered through innovative religious programming on radio and television that reached millions of Americans weekly for decades.  He used that programming to spread the teachings of Christ and as means of soliciting hundreds of millions of dollars in donations for religious causes.  Dr. Falwell also gave numerous public speeches and authored a plethora of books, newsletters, and other publications throughout his lifetime.  Through both paid and unsolicited widespread national media exposure over the course of decades, the distinctive JERRY FALWELL trademark remains widely recognizable by consumers as signifying Dr. Falwell's brand of religious goods and services to this day.

23.     In 1956, at the age of 22, Dr. Falwell founded Thomas Road Baptist Church.   The same year, Dr. Falwell established *The Old Time Gospel Hour*, which would soon become a successful nationally-syndicated radio and television ministry regularly featuring Dr. Falwell's appearance and airing until Dr. Falwell's passing in 2007.  By 1971, *The Old Time Gospel Hour* aired in every U.S. state on over 300 television stations.

24.     From no later than 1971, and continuing throughout the rest of his lifetime, Dr. Falwell regularly, consistently, and continuously used his name, JERRY FALWELL, as well

variations on that name,[2] as a trademark in commerce in connection with multiple commercial pursuits relating to religious goods and services, including religious education and instruction, nationally-broadcast television and radio programs, publication and national distribution of newsletters, books, and home video, and religious travel services.  These pursuits collectively generated hundreds of millions of dollars.  Through these pursuits and extensive promotion and advertising in support of them, Dr. Falwell had common law rights in JERRY FALWELL (and the aforementioned variations) as trademarks as these designations were recognized by consumers as designations of source for Dr. Falwell's brand of religious goods and services.

25.     In the ensuing decades, Dr. Falwell rose to prominence as a religious leader and an activist.  He put his well-known name to work for Christ.  By the 1970s, Dr. Falwell's name, image, and distinctive trademarks were well-known to the consuming public in the United States, having gained much national exposure through *The Old Time Gospel Hour* as well as through Dr. Falwell's many other public appearances, statements, and writings.  Between 1971 and 2006, Dr. Falwell authored or co-authored at least 21 books.

26.     Recognizing its value, Dr. Falwell was very protective of how his JERRY FALWELL trademark was used and how his brand was depicted.  Across his various business and religious pursuits, including Liberty, Dr. Falwell consistently and continuously exercised control over the use of his trademark and name and image in each instance.  Whereas other religious leaders like Oral Roberts and Bob Jones founded universities named after themselves, Dr. Falwell

---

[2] These variations include but are not limited to Rev. (or Reverend) Falwell, Rev. (or Reverend) Jerry Falwell, Dr. Falwell, Dr. Jerry Falwell, including with or without the use of the suffix "Sr." and/or his middle name or middle initial ("Laymon" and "L", respectively). When used herein, "JERRY FALWELL trademark" refers to the trademark JERRY FALWELL, including JERRY FALWELL as a mark at common law and the federally registered JERRY FALWELL trademark. "JERRY FALWELL trademarks," plural, encompasses the related marks in which Dr. Falwell acquired rights as alleged by the foregoing paragraph.

intentionally did not do that with Liberty — which otherwise underwent two name changes over the decades presenting multiple opportunities.  While Dr. Falwell was deeply proud of Liberty, he did not wish for his brand to be confined to a single institution of higher learning alone, but to extend beyond academics.  Thus, Dr. Falwell never transferred to Liberty any right to use the JERRY FALWELL trademark, or Dr. Falwell's name and image, in any way Liberty saw fit.

27.     On January 14, 2003, Dr. Falwell applied to register the JERRY FALWELL trademark with the United States Patent & Trademark Office ("USPTO").  On January 10, 2006, the USPTO registered the JERRY FALWELL trademark, with registration number 3039870 (*see* Exhibit A).  The registered mark covers the following goods and services: "Newsletters in the field of moral and religious issues and events; Retailing services via computer and direct response retail services by means of commercials featuring religious items; Educational lecturing and teaching services, namely, religious instruction and teaching in the field of religious studies; Preaching and counseling, namely, ministerial services."

28.     The federal registration for the JERRY FALWELL trademark (Reg. No. 3039870) is incontestable.

29.     After Dr. Falwell's passing in 2007, ownership of the JERRY FALWELL trademarks, including specifically Registration No. 3039870, and Dr. Falwell's rights to his name and image under Virginia Code § 8.01-40, passed to the Falwell Family Trust.

30.     The University and the Trust subsequently entered into an agreement on February 21, 2014.  In the Agreement, the University "acknowledge[d] the Trust's ownership of and exclusive right to use and register its JERRY FALWELL mark … and agree[d] not to oppose, petition to cancel, or otherwise challenge or object to the use or any current registration and/or

subsequent application for registration by the Trust of marks consisting of or comprising the term JERRY FALWELL …"

31.     Though Dr. Falwell passed away in 2007, the Falwell Family Trust has continued to use the JERRY FALWELL trademark in commerce, including through licensed use by nonparties.  For example, the JERRY FALWELL mark continues to be used in the field of religious education and instruction, and is used, together with the related "falwell.com" mark, in connection with the goods and services of Thomas Road Worldwide, which includes, among other things, an e-commerce store that sells religious literature and other media, including works authored by Dr. Falwell.

**B.      Liberty's Executive Committee Seizes Control Of The University**

32.     For the first 49 years of its 52-year existence, a Falwell family member served as Chancellor or President of Liberty University.  Dr. Falwell founded Liberty in 1971 and led the school as its Chancellor until his passing in 2007.  At that time, his son, Plaintiff Mr. Falwell, assumed the role of the University's President and Chancellor, in accordance with a plan of succession laid down by the Board of Trustees at the urging of his father, which role he held until August 24, 2020.

33.     Even before his tenure as President and Chancellor, Mr. Falwell had been widely credited—including by Dr. Falwell himself—as having saved Liberty from the brink of financial ruin.  And he has similarly been widely credited for steering Liberty's transformation into the world's leading evangelical university, and, indeed, a prominent university nationally and internationally, during his time as President and Chancellor.  Mr. Falwell initially joined Liberty as its General Counsel in 1988 after obtaining a Juris Doctor from the University of Virginia School of Law and passing the Virginia bar exam in 1987.  He was appointed to the Board of Trustees of Liberty in 2000 and became Vice-Chancellor in 2003.  Beginning with his time as

General Counsel, Mr. Falwell's efforts were responsible for Liberty climbing out of approximately $100 million in debt.  Indeed, Dr. Falwell himself wrote in his auto-biography, "God sent [Jerry] to me just in time.  While we employ many attorneys for the legal needs of this large and complex ministry, Jerry is the best attorney I know.  This is not an exaggeration.  At age 34, he is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."  Under Mr. Falwell's leadership, Liberty's finances were transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation.  And he is widely recognized for enhancing the school's overall profile and standing with substantial contributions ranging from enrollment, academic program, commitment to the school's doctrinal foundations, sports, to infrastructure.

34.     The majority of Liberty's Board of Trustees (or the "Board") consists of pastors and others involved in evangelicalism as a profession.  Many of them were added to the Board at a time long ago when it was believed pastors would boost revenue by attracting students from their churches. This belief was ill-founded; indeed, pastors would in practice seek scholarships for their students and the applicant pool did not increase materially as a consequence of their presence on the Board.  Moreover, within the past ten years or so, the Board of Trustees adopted a resolution granting scholarships to children and grandchildren of Board members, a benefit that, in the aggregate, is worth an extraordinary sum.  The Board's members largely lack any experience comparable to running a major university. Very few of them have had anything to do with building Liberty into the institution it became under Dr. Falwell and Mr. Falwell's stewardship.  And an even smaller number have actually made any donations to Liberty, which is highly unusual for a board of trustees for a major university.

12

35.     The Executive Committee is a committee of the Board of Trustees typically ranging in size from 5 to 7 individuals and exercises the full authority of the Board when it is not in session, which sessions occur for brief periods twice annually.  The Executive Committee was initially conceived of during a time before email and Zoom meetings in order to allow a subset of the Board to act in-person on an urgent basis.  Although modern technology has rendered those considerations moot, the Executive Committee has remained in place and, in practice, exercises the full power of the Board for the vast majority of the year, in violation of Southern Association of Colleges and Schools Commission on Colleges Principles of Accreditation,[3] which direct that a university not be controlled by a minority of board members.  During his time as President and Chancellor, Mr. Falwell reported to the Executive Committee.

36.     Commencing no later than the summer of 2020, certain members of the Executive Committee and the Board of Trustees maneuvered to eliminate Mr. Falwell from the leadership of Liberty and wrest control over the University and its sizable $2 billion endowment, upon information and belief, for their own benefit, without oversight by or interference from Mr. Falwell, who they knew would seek to protect the institution his father founded and stand in the way of their attempts to exploit Liberty for their own gain.  Indeed, after Mr. Falwell left Liberty in August 2020, these members directed Liberty to dole out hundreds of thousands of dollars in self-dealing transactions, purportedly as "donations," to organizations controlled by these members and/or their close affiliates.

---

[3] "SACS" refers to Southern Association of Colleges and Schools Commission on Colleges (or SACSCOC), which is the body for the accreditation of degree-granting higher education institutions in the Southern states.  Liberty is currently an accredited institution.  Accreditation standards are set forth in The Principles Of Accreditation: Foundations for Quality Enhancement (adopted December 2017).

37.     In the summer of 2020, certain Executive Committee members saw an opening to force Mr. Falwell's exit by exploiting his health condition.  These members attempted to induce Mr. Falwell to take a leave of absence purportedly because of excess drinking and by exaggerating his use of alcohol—notwithstanding that Liberty had not enforced any rules prohibiting drinking by faculty for decades (at the direction of Dr. Falwell), and, indeed, at least two members of the Executive Committee drink, one of whom has been to rehab three times.  At the time, Mr. Falwell's wife suspected that drinking or some form of depression may have been the reason for his failing health.   In reality, however, Mr. Falwell was suffering from abnormalities in his lungs, resulting from a genetic condition he did not know he had at the time, that lowered his blood oxygen to dangerously low levels and severely and negatively impacted his health.  When he visited a detox center at the request of the Executive Committee, the staff there told him that he was suffering— not from alcoholism—but from a potentially lethal lung condition that required immediate emergency treatment.  (Liberty knows this condition—not excess drinking—was responsible for Mr. Falwell's ill-health, as it subpoenaed Mr. Falwell's medical records in an unrelated lawsuit.)

38.     Shortly thereafter, however, news broke of Mr. Falwell's wife having had an extramarital affair several years earlier.  Certain members of the Board of Trustees and/or Executive Committee immediately set about to use news of the affair as pretext for forcing Mr. Falwell's permanent exit, notwithstanding that Mr. Falwell's wife, not Mr. Falwell, had the affair, and the two remained committed to their marriage.  The Executive Committee refused to meet with Mr. Falwell to hear his side of the story after repeated requests.  Instead, certain members of the Executive Committee gave Mr. Falwell an ultimatum—resign or face the potential for termination.  Under these coercive circumstances, Mr. Falwell submitted his resignation "without

cause" and "for good reason," as those terms are defined by his employment agreement. The Board of Trustees accepted his resignation unanimously.

39.     The standard these members of the Board and its Executive Committee purported to hold Mr. Falwell to was different from the standard that Liberty had applied to other high-ranking officials of the University.  For example, one former University President was sued by a former Liberty employee for sexual harassment, and Liberty retained him in that position notwithstanding that a payment had to be made to that employee as a result.  And it is common knowledge within the relevant communities that Ed Hindson, a recently deceased televangelist and former Dean of Liberty's School of Divinity, had an extramarital affair during his time at Liberty, and Liberty nonetheless employed him as a high-ranking official after the affair.  It is likewise common knowledge within the relevant communities that Ron Godwin, a former provost of Liberty, had an extramarital affair with his secretary while working at a Liberty affiliate Moral Majority, Inc., but, again, Liberty nonetheless employed him as a high-ranking official after the affair.  And a current member of the Executive Committee has admitted to previously having more than one affair.  All of these incidents involved situations in which officials themselves were engaged in affairs or other misconduct, in contrast to Mr. Falwell, who had not had engaged in similar misconduct or had any affair.  And Liberty nonetheless had permitted these individuals to continue in its employ, consistent with a long-standing culture of forgiveness that is part and parcel of Dr. Falwell's brand of evangelicalism.

40.     With Mr. Falwell gone from leadership, members of the Board of Trustees and its Executive Committee quickly set about to, upon information and belief, implement their plans to elevate their position of power within Liberty and then exploit that position to benefit themselves through a series of questionable self-dealing transactions that have the appearance of kickbacks

and have diverted over a million dollars from Liberty to organizations that are controlled by certain Board members or their close associates.

41.     Below are examples of "donations" Mr. Falwell has learned Liberty made which benefit organizations that are, upon information and belief, controlled by members of the Board of Trustees and its Executive Committee, or their close associates.  Upon information and belief, Liberty entered these transactions at the decision of the Executive Committee.

a)  Jerry Vines is a member of the Executive Committee.  After joining the Executive Committee and in the fiscal year ending June 2021, Liberty paid $100,000 to Jerry Vines Ministries, which is, upon information and belief, controlled by Vines. While designated as a not-for-profit on Liberty's books, Jerry Vines Ministries is in the business of selling religious media through its ecommerce store (including books, DVDs, and so-called annual subscriptions to different religious "curriculums" that are sold for in excess of $7,000).

b)  Tim Lee is the Chairman of the Board of Trustees and become an Executive Committee member after Mr. Falwell resigned from Liberty.  After becoming an Executive Committee member, in the fiscal year ending June 2021, Liberty paid $100,000 as an alleged "donation" to Tim Lee Ministries, which, upon information and belief, is controlled by Lee.  While recorded as a not-for-profit on Liberty's books, the business of "Tim Lee Ministries" appears to be collecting speakers' fees for Lee to appear at events, and an online gift shop that sells t-shirts, lapel pins, and Lee's novel, *Born on the Fifth of July, Recreated in Vietnam*.  In the fiscal year ending June 2022, Liberty made a "donation" of $76,000 to Wylie Preparatory Academy, a school in Texas that Lee's granddaughters attended.

c)  Harvey Gainey was, until his death in November 2021, a member of the Board of Trustees and Executive Committee.  He also served as Vice Chairman of the Board of Trustees.   Between 2020 and 2021, Liberty paid $125,000 in purported "donations" to Gainey Foundation which was, upon information and belief, controlled by Gainey.  The Gainey Foundation operated Two Moose Camp in Montana, which was allegedly run as a not-for-profit.  Upon information and belief, however, after Gainey's trucking company went bankrupt from approximately $240 million in unpaid debts (which accrued even as he paid millions to himself), he used Two Moose Camp to finance his lifestyle.   From the period 2018 through 2021, Gainey secured annual contributions from Liberty—again by decision of the Executive Committee—for students, staff, and faculty to "visit" his camp for a week in amounts ranging from $30,000 and up.

d)  Jerry Prevo assumed the presidency of Liberty University on an interim basis in August 2020, which role he held until May 2023.  He now holds the title of President Emeritus.  Prior to and concurrent with his interim presidency, Prevo was a member on the Board of Trustees and its Executive Committee, positions he continues to hold.  William F. Graham IV became Vice Chairman of the Board of Trustees in 2021.  Prevo served for many years on the board of Samaritan's Purse, which is, upon information and belief, under the control of Franklin Graham, father of William Graham and president of Samaritan's Purse.  Upon information and belief, Franklin Graham is Prevo's closest advisor; during the limited times Prevo appeared on campus to fulfill his duties as interim president, he would speak with Graham virtually every day by phone before making any decisions.   In the fiscal

year ending June 2021, Liberty paid $200,050 to Samaritan's Purse.  In the same year, Liberty paid another $200,000 to Hope Partners International, which is an organization that is, upon information and belief, controlled by Kirk Nowery, the former Chief Operating Officer of Samaritan's Purse.  In the following year, Liberty paid the organization another $414,960.  Upon information and belief, Hope Partners International secured the "donation" from Liberty by virtue of its ties to Prevo and Graham.

e)   During Mr. Falwell's tenure as president of Liberty, Prevo—then an Executive Committee member to whom Mr. Falwell ultimately reported—pressured Mr. Falwell for Liberty to pay thousands of dollars for Prevo's grandson to receive training in flying planes at Liberty's expense.  After Prevo assumed the presidency of Liberty on an interim basis, he sought for Liberty to improperly divert hundreds of thousands of dollars of his salary to his personal foundation, which Liberty eventually ceased to do on advice of counsel.  However, Liberty paid Dr. Prevo's wife a substantial sum for her role as wife of the president of Liberty.  Upon information and belief, based on publicly available flight records, after assuming the presidency, Prevo racked up at least hundreds of thousands of dollars in expenses associated with his use of Liberty's corporate jet.  Flight records show that Prevo used the University's jet to fly between Virginia and his home in Alaska on numerous occasions, each trip costing at least $35,000, as well as his home in Arizona, each trip costing $20,000.

42.   Upon information and belief, certain members of the Board of Trustees and its Executive Committee have thus far succeeded in their scheme to elevate and exploit their positions

of power within Liberty in significant part by co-opting the University's General Counsel, David Corry, who has empowered and enabled these actions. Indeed, after Mr. Falwell's resignation, Mr. Corry's salary increased by 60% in a single year, despite no apparent change in job title, duties, or performance, for total compensation of $491,728. In addition, upon information and belief, Mr. Corry lobbied for the adoption of a new rule whereby the Executive Committee could not meet unless he was present, which rule was adopted, further enhancing his influence over the Executive Committee as well as the ability of certain members of the Board of Trustees and its Executive Committee to carry on their scheme.

43.     Around the same general time that Corry looped himself into the EC, Liberty made a payment of $588,191 to Liberty Counsel Inc., where David Corry was working immediately prior to joining Liberty as General Counsel. Liberty Counsel is an organization that engages in litigation on behalf of ultra-right wing social causes. The entity is not related to defendant Liberty and does not advance Liberty's mission—*i.e.*, to educate its students.

44.     None of the foregoing payments that Liberty has made to outside organizations have served the school's mission, which is to educate students, and none of them benefit the students of Liberty, many of whom take out loans or pay tuition money to attend Liberty. These payments collectively exceed one million dollars of money that could have otherwise been spent in service of the school's mission and to the benefit of its students. The extraordinary outlay is in contrast to the principles enshrined by the SACS accreditation principles, which emphasize the importance of fulfilling the University's mission.

45.     Board of Trustees and Executive Committee member Carroll Hudson was elevated to the role of Chairman of the Executive Committee after Mr. Falwell's departure from Liberty. Because the Executive Committee exercises control when the Board of Trustees is not in session—

the vast majority of the year—Hudson is, upon information and belief, the de facto presiding officer of Liberty's governing board.  Hudson has previously been accused of abusing his role as a trustee in connection with the assets of a family trust.  Upon information and belief, an organization currently under the control of Hudson manufactures, among other things, portable table top fire pits that carry the LIBERTY FLAMES designation.  These fire pits are sold for approximately $100 each in Liberty University's bookstore.  Liberty's sale of the fire pits is, upon information and belief, the result of actions taken by Hudson.  The SACS accreditation principles, however, provide that an institution is to ensure that the presiding officer of its governing board is "free of any contractual, employment, personal, or familial financial interest in the institution."

46.     That is not all.  In the past two years, a significant number—at least 12—of members of the Board of Trustees have also received substantial payments from Liberty, all in different amounts, many in the range of tens of thousands of dollars, and one as high as in excess of a hundred thousand dollars.  In certain cases, the same individuals hold roles at Liberty such as adjunct professor or similar roles.  The SACS accreditation principles provide that an institution is to ensure that, in addition to the presiding officer, the majority of voting members of its governing board "are free of any contractual, employment, personal, or familial financial interest in the institution."  The number of Board members who are paid by Liberty, or who otherwise upon information and belief control organizations that Liberty has paid as alleged herein (or organizations under the control of their close associates), is at least a majority of the Board of Trustees.

47.     Brazenly, certain members of the Board of Trustees and its Executive Committee have been so bold to, upon information and belief, deflect and distract from, and therefore hide from scrutiny, their own questionable financial dealings, by falsely suggesting in public that Mr.

Falwell had committed unspecified financial wrongdoings.  Certain members of the Board of Trustees and its Executive Committee caused Liberty to suddenly announce—within a day of Mr. Falwell's resignation in August 2020—that it was hiring one of the world's leading forensic firms to conduct an investigation of Mr. Falwell's handling of the University's finances, with the false implication being that Mr. Falwell had committed unspecified financial misconduct during his time as President of Liberty.  The investigative firm Liberty hired, Baker Tilly, set up a website inviting the public to report information about anything "illegal, unethical from a business perspective, or improper in the context of the operation of a non-profit organization," essentially stoking unfounded concerns that Mr. Falwell had abused Liberty's trust when, in reality, upon information and belief, it was certain members of the Board of Trustees and its Executive Committee who were seeking to do so.

48.     Ultimately, the investigation cost Liberty, upon information and belief, millions of dollars, and has revealed nothing improper about Mr. Falwell's actions at Liberty.

49.     In addition to the groundless assertions regarding purported financial improprieties, Liberty also, again shortly after Mr. Falwell's resignation, began to publicly disparage Mr. Falwell. Indeed, the very day after accepting Mr. Falwell's resignation, a high-ranking University official gave a speech to the Liberty community in which he implied that Mr. Falwell had engaged in conduct that was "shameful" and a "sin."  In the months following Mr. Falwell's resignation, Liberty—acting at the direction of the Executive Committee—continued to disparage Mr. Falwell.

50.     Notwithstanding the false attacks, Mr. Falwell and his wife Becki Falwell nonetheless remained (and continue to remain) popular among many Liberty employees, officials, students, alumni, and donors.  Thus, in April 2021, when Mr. Falwell and Ms. Becki Falwell attended a sporting event on Liberty's campus to support their daughter (a then-student of Liberty),

21

they were warmly received by other attendees who vied to pose for photos with the family, which were posted to social media.

51.     Upon information and belief, this upset certain members of the Board of Trustees and its Executive Committee, and, days later, Liberty, at the Executive Committee's direction, banned Mr. and Ms. Falwell from campus, notwithstanding that, among other things, Dr. Falwell—Mr. Falwell's father—is interned on campus grounds.  Liberty directed faculty and staff to cease communications with Mr. and Ms. Falwell.  Liberty removed photos of Mr. Falwell that had been long-displayed on campus.  And Liberty implemented, upon information and belief, a policy or practice of deleting comments favorable to or otherwise supportive of Mr. Falwell that had been posted to any of Liberty's social media accounts.  Upon information and belief, Liberty has also digitally altered photographs that include Mr. Falwell to remove him before using the photos in promotional materials.

52.     Members of the Board of Trustees and its Executive Committee also directed their cruelty at other Falwell family members.  For instance, as University President, Mr. Falwell had previously hired his son, Trey Falwell, as an administrative assistant.  Later during Mr. Falwell's tenure, the University's Chief Operating Officer promoted Trey to a Vice President's role to oversee various departments.  During April 2021—the same month Liberty banned Mr. and Ms. Falwell from campus—Mr. Prevo executed a particularly heinous method of firing Trey.  As was known by Prevo and close family members at the time, Trey's wife had recently suffered a miscarriage and the family was grieving.  On the Friday of Easter weekend, Good Friday (April 2, 2021), Prevo communicated to Trey, in sum and substance, that the Board was going to be in session soon and that Board members wanted to terminate Trey's employment, and that Prevo could "fool" the Board to drop the issue if he could present a resignation letter signed by Trey as

if Trey had already left on his own accord.  Prevo told Trey that he could not tell his parents about

his request.  Prevo subsequently informed Trey that he needed his resignation letter by Monday or

Prevo would terminate his employment.  Trey did not execute the phony resignation letter Prevo

demanded, and, on Monday, April 12, 2021, Trey was summoned to the Human Resources Office

where CFO Rob Ritz fired Trey.  Liberty later that day directed police officers to observe Trey

vacating his office and escort him off premises.

53.     Mr. Prevo also sought to rid Liberty of staff, faculty, and vendors who were

perceived to be close to Mr. Falwell as well as those who are African American.  Around the time

that Prevo was ascending to the role of interim President of the University, news outlets reported

on controversy in Alaska over racism at a Christian school run by Anchorage Baptist Temple,

which church Prevo founded and oversaw for almost 50 years.  Former students of the school

asserted that they faced overt racism at the school and accused the school of segregating white and

minority students in classes and school events.  Prevo was Chairman of the Board of Trustees at

the time he ascended to the role of interim President of Liberty.  When he did so, the then-Vice

Chairman of the Board, Allen McFarland—an African American man with forty years of service

as a Board member—assumed the role of Chairman in order of succession. (The Board had

previously appointed him as Vice-Chairman at Mr. Falwell's request.)  Upon information and

belief, as a result of actions taken by Prevo in concert with others, Mr. McFarland was removed

as Chairman, and Tim Lee was appointed his successor.  Around the same general time period,

Prevo also terminated the employment of several other African American employees and

independent contractors who were perceived to be close to Mr. Falwell, including one of the

University's highest-performing recruiters and others who worked in the University's Equity and

Inclusion department.

54.     The same month (April 2021), Liberty filed a lawsuit against Mr. Falwell in state court, remarkably alleging that, *inter alia*, Mr. Falwell violated his duties to Liberty on the basis that Mr. Falwell purportedly should have disclosed the circumstances surrounding the affair to Liberty, notwithstanding that, among other things, the Board of Trustees unanimously accepted Mr. Falwell's resignation without cause and for good reason, as those terms are defined in his employment agreement, with full knowledge of the affair.

55.     Upon information and belief, the motivation behind the lawsuit was the desire of certain Executive Committee members to harass and intimidate Mr. Falwell and ensure that he would not stand in their way of seizing control of Liberty and its billions of dollars in assets. Indeed, had Liberty waited just one day to file the suit, the commencement of the suit would have been subject to a full vote by the Board of Trustees, as the Board held one of its two bi-annual sessions the day after the suit.  Upon information and belief, the Executive Committee's decision to proceed with suit without seeking Board approval upset several members of the Board of Trustees who remained supportive of Mr. Falwell, as well as other Board members who opposed the filing of the meritless lawsuit.   The litigation is ongoing.

## C.     Liberty University's Acts of Infringement

56.     By the fall of 2021, upon information and belief, Liberty was well in the throes of an identity crisis—members of the Executive Committee as well as other high ranking or influential Board of Trustees members and University officials acknowledged that Liberty had severed its link in Mr. Falwell to the Dr. Jerry L. Falwell Family Trust and its highly valuable Falwell IP.  Upon information and belief, Liberty understood that, without Mr. Falwell's consent, it could not use the Falwell IP in commerce in a manner that was likely to confuse consumers or for purposes of advertising Liberty or for purposes of trade.

57.     Accordingly, upon information and belief, Liberty—operating at the direction of the Executive Committee and led by its interim president Prevo—developed plans that would confuse consumers into believing that Liberty is endorsed or sponsored by, or otherwise associated or affiliated with, the JERRY FALWELL brand and the Falwell Family Trust.

58.     Commencing by no later than October 2021 and continuing thereafter, Liberty executed a promotional campaign that repeatedly employed the JERRY FALWELL trademarks, and marks confusingly similar thereto, in such a manner as to be likely to create confusion as to the relationship between Liberty and the JERRY FALWELL brand and the Falwell Family Trust. Liberty systematically deployed the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, across multiple media platforms it uses to advertise and promote the University (including print, digital, web, social media, and other audiovisual content, including commercials), and for purposes of trade, in such a way as to send the unmistakable message that Liberty is endorsed, sponsored or approved by, or otherwise affiliated, connected, or associated with the JERRY FALWELL brand and the Falwell Family Trust (or, at a minimum, in a way that is likely to create confusion).   In fact, it is not; Liberty disregarded the Trust's rights in the JERRY FALWELL trademarks and the rights in Dr. Falwell's name and image, and did not obtain consent or permission of the Trust or Plaintiff Mr. Falwell before undertaking to confuse the public as to its relationship with the JERRY FALWELL brand and the Falwell Family Trust.

59.     In or around October 2021, Defendant Liberty University used the JERRY FALWELL trademarks, without authorization, in advertising and promoting its plans to expand its Hancock Welcome Center—a "visitor's center" where future Liberty students begin their campus tour—with a new wing named the JERRY FALWELL CENTER.

60.     While Liberty stated that the new JERRY FALWELL CENTER would "honor" Dr. Falwell, Liberty's actions, and its statements in both public and private, reveal that, upon information and belief, Liberty intends to use the JERRY FALWELL CENTER as a facility that primarily serves to advertise and promote *the University* to consumers of higher education, and to do so by creating a false association with JERRY FALWELL brand and the Falwell Family Trust in order to commercially benefit from the immense goodwill and reputational value associated therewith.

61.     For example, in or around November 2021, Liberty's Vice President of Major Construction stated, "the mission for the building is to create a center where a variety of visitors can experience not only the founder's vision of Liberty University, ***but also to highlight what Liberty is today***."  He added, "Our campus has grown to the size where it is difficult to see it all in one visit . . . The idea is for us to be able to condense a long physical tour into a highlighted tour that allows visitors to see amazing things on campus that we are very proud of."

62.     Similarly, before a decision had been made to construct or even announce the JERRY FALWELL CENTER, Liberty's interim president, Mr. Prevo, admitted in a private communication that Liberty was seeking to fill the potential center with "video and interactive [displays] [that] will appeal to parents on why they should send their students to [L]iberty."  He added that he would not construct the center unless he could be convinced "that it is possible to produce a wow factor in recruiting students and adults" and that the University was determining whether the center could "inspire students to want to come to [Liberty] and inspire parents to want to send their students to [Liberty]."

63.     On a separate occasion, Mr. Prevo informed members of the Board of Trustees that opening the JERRY FALWELL CENTER was the most important priority of his presidency.

Upon information and belief, Mr. Prevo made those remarks because he viewed it as important that Liberty lay claim to the JERRY FALWELL trademarks and name in order to confuse consumers into believing that Liberty University is endorsed or sponsored by, or otherwise associated or affiliated with, the JERRY FALWELL brand and the Falwell Family Trust.  That is, Prevo understood that an endorsement of Liberty by the JERRY FALWELL brand—which the JERRY FALWELL CENTER, as well as Liberty's other infringing uses of the JERRY FALWELL mark and name and image as alleged herein, would signify to the reasonable consumer—is material to consumers of higher education in selecting which university to choose to pursue a religious education and deciding whether to pay for enrollment in one of Liberty's programs.

64.     Prevo has personally directed the development of the JERRY FALWELL CENTER and has been closely involved in both its development and Liberty's promotion of it.  Upon information and belief, Prevo conceived of the JERRY FALWELL CENTER after consultations with his closest advisor, Franklin Graham, the son of the late Billy Graham, who is one of the largest public figures in the evangelical community.  After his dad passed away in February 2018, Franklin expressed to Mr. Falwell his shock at how much revenue Liberty generated and expressed his interest in founding a "Billy Graham University" as a means of making money from his dad's name.  Plans for Billy Graham University never materialized, however, and, upon information and belief, Franklin instead assumed a role in the takeover of Liberty.  He previously had founded and launched the Billy Graham Library, a center that is in the style of a post-presidential library and is believed to have originated the idea of the JERRY FALWELL CENTER along with Jerry Prevo. Based on his years of involvement with Liberty and his knowledge of Dr. Falwell's brand of religious goods and services, and, upon information and belief, as reinforced by his consultations

with Franklin Graham, Prevo understood that perceived endorsement by the JERRY FALWELL brand would materially influence the purchasing decisions of consumers of higher education.

65.     Thus, upon information and belief, Liberty has been developing, is continuing to develop, and plans to open to the public a facility that will extensively use the JERRY FALWELL trademarks, and marks confusingly similar thereto, as well as Dr. Falwell's name and likeness, in service of advertising and promoting Liberty's educational goods and services and for the purposes of trade, while trading on the reputation and goodwill of the JERRY FALWELL brand.

66.     Following its initial announcement of the center, Liberty continued to distribute advertising and promotional materials that utilized the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, without authorization and in a manner that is likely to confuse.

67.     For example, in or around November 2021, Liberty University published and began distributing copies of the Fall 2021 issue of the Liberty Journal (herein the "Fall 2021 Magazine").

68.     The Liberty Journal is one of the primary means that Liberty advertises and promotes the University.

69.     In the Fall 2021 Magazine, Liberty sought, upon information and belief, to cement a false association between itself and the JERRY FALWELL brand.

70.     To start, the cover of the Fall 2021 Magazine includes a photo of Dr. Falwell and Mr. Falwell.  The inner pages of the issue contain at least seven additional photos of Dr. Falwell and numerous references to Dr. Falwell and the JERRY FALWELL CENTER.

71.     Among other things, the Fall 2021 Magazine includes an article titled "From His Own Hand" which is accompanied by a large photo of Dr. Falwell.  The article informs readers that Liberty commissioned a 6-month study of Dr. Falwell's handwriting and created two custom fonts designed to "replicate the distinct handwriting of … Dr. Falwell."  The article notes that, on

the cover of the magazine, the masthead "LIBERTY JOURNAL" appears in one of the Dr. Falwell

fonts.   The font appears nearly a dozen times throughout the issue and encourages students,

alumni, and others to "see how many places you can find the new Falwell fonts used around

campus and on the website."

72.     After the table of contents, the first page of the Fall 2021 Magazine contains a

"message from the president" of Liberty that purports to "announce the new Jerry Falwell Center

… scheduled to open in 2023" as "an extension of the Hancock Welcome Center."  The article is

paired with a rendering of the JERRY FALWELL CENTER (depicted below), which prominently

features the JERRY FALWELL trademark on the building's exterior in the style of Dr. Falwell's

own handwritten signature.



73.     The same rendering appears a second time ten pages later in the Fall 2021

Magazine.  On that page, the Fall 2021 Magazine elaborates, with the University's then-president

stating "The center will show how Liberty is incorporating a Christian worldview and evangelical

fervor throughout all areas, including academics, athletics, and student life," once again reflecting

Liberty's intention, upon information and belief, to use the JERRY FALWELL CENTER as advertising and promotion for Liberty to consumers of higher education.

74.    The same section of the magazine includes a three-page excerpt of a writing by Dr. Falwell, which is paired with four photos of Dr. Falwell, one of which is enlarged and runs the length of the magazine.

75.    The Fall 2021 Magazine includes advertisements for a book published by Liberty and other Liberty University merchandise being offered for sale by Liberty, such as hats and mugs.

76.    Around the same time, Liberty opened a "self-guided tour" on its campus.  At each of nine different points along the walking tour, Liberty posted footprint engravings made from a pair of Dr. Falwell's shoes.  Liberty publicly announced the tour and emphasized the engravings of Dr. Falwell's footprints in advertising and promotional materials.

77.    After releasing the Fall 2021 Magazine, Liberty continued to use, without authorization, the JERRY FALWELL trademarks, and Dr. Falwell's name and image, to advertise and promote itself and the JERRY FALWELL CENTER.

78.    For example, following the initial publication of the Fall 2021 Magazine, Liberty flooded its social media platforms with advertisements for the University that used the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, without authorization and in a manner that is likely to confuse.

79.    Liberty's social media accounts, including Instagram, Facebook, and Twitter, are one of the primary means by which Liberty advertises and promotes the University.

80.    On or about February 22, 2022, Liberty posted a tweet to its Twitter page linking to a version of the article described in Paragraph 71, *supra*, that Liberty published to its website, stating that "a special font was created by Liberty University" based on Dr. Falwell's handwriting.

The tweet included a photo of Dr. Falwell signing a document.  The tweet further notes that "The masthead for the print version of this magazine, "LIBERTY JOURNAL," appears in a handwriting-style font."

81.     On March 24, 2022, Liberty posted another tweet to its Twitter account, utilizing one of the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, in an advertisement for a book being published and offered for sale by Liberty.  The tweet references Dr. Falwell having "walked and prayed over Liberty Mountain" and directing readers to "[p]urchase your copy" of the book, providing a link to the website where the book may be purchased.

82.     On or about October 24, 2022, Liberty published and publicly distributed a commercial to its Instagram account advertising Liberty's football games, from which Liberty generates substantial revenue, and using one of the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, to do so.  The video contains footage of, among other things, Liberty's football team playing football at the University's Williams Stadium and speeches by the coach referencing Dr. Falwell intermixed with footage of Dr. Falwell's image and clips of Dr. Falwell speaking, among other things, about football.

83.     The October 24 commercial followed another commercial that Liberty published and distributed on its Instagram account or about October 21, 2022, again advertising Liberty's football games using Dr. Falwell's image to do so.

84.     The foregoing examples of the use of the JERRY FALWELL trademarks and Dr. Falwell's name and image are non-exhaustive; Liberty distributed additional advertising and promotional materials during the same time period that use the JERRY FALWELL trademarks and/or Dr. Falwell's name and image in a manner that is likely to confuse.

85.    On or about November 16, 2022, Liberty hosted a convocation ceremony on its campus in Lynchburg, Virginia, which event Liberty filmed and broadcasted online and continues to make available for viewing.

86.    During the event, Liberty's then-president, Jerry Prevo, appeared in-person and publicly unveiled new renderings of the JERRY FALWELL CENTER to an arena packed with thousands of students and others watching the live broadcast online, and disclosed information about the pervasive extent to which Liberty intends to use the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, throughout the center.

87.    During the event, Mr. Prevo revealed the below-rendering of the so-called "core" of the JERRY FALWELL CENTER, which is a lobby spanning the height of two levels and which includes a floor-to-ceiling portrait of Dr. Falwell, as seen below (at right).



88.    Mr. Prevo informed the audience, "we're going to be using the entertaining technology of our day … we're consulting with the people who do Disneyland, Disney World … we want to make this an experience you go through it and say wow," again referencing the "wow

factor" in student recruitment that Mr. Prevo had previously cited in private communications as a condition for moving forward with the center.

89.     Mr. Prevo then presented to the audience a rendering of a theater with a hologram of Dr. Falwell appearing on stage beneath a banner bearing the initials for Liberty University (below).  Mr. Prevo stated, "The Jerry Falwell theater, they tell me, that they can make him walk right out on the stage as if he was literally there and speak to you … he's … a man of great faith, we're going to use some of his sermons."



90.     Mr. Prevo thus confirmed in his public remarks that Liberty intends to not only use the JERRY FALWELL trademarks and name both in the center's name and throughout the center, but that Dr. Falwell's image will be utilized throughout the center as well.

91.     Liberty continues to use the JERRY FALWELL trademarks, as well as Dr. Falwell's name and image, in advertising and promotion for the JERRY FALWELL CENTER and the University, as well as to generate revenue for Liberty.

92.     For instance, Liberty is using the JERRY FALWELL trademark as part of the infringing domain name JERRYFALWELLCENTER.COM, which is the University's official website for the JERRY FALWELL CENTER.  The website makes numerous uses of the trademark, and marks confusingly similar thereto, and includes Dr. Falwell's name and image. The website includes several statements that are likely to confuse as to Liberty's relationship with JERRY FALWELL and the Falwell Family Trust.  Through the website, Liberty solicits donations to the University and links to a form for processing such donations.

93.     The infringing website also uses the JERRY FALWELL trademarks and Dr. Falwell's name and image in in connection with advertising and promoting its sale of so-called "naming opportunities," *i.e.*, the right to have a room in the JERRY FALWELL CENTER named after an individual.  Upon information and belief, Liberty is offering for sale the naming rights to eleven different rooms or areas in the JERRY FALWELL CENTER in exchange for extraordinary sums of money.

94.     Liberty is also selling merchandise bearing the JERRY FALWELL trademark without authorization of the Trust.  For example, upon information and belief, Liberty has commissioned the manufacture of a Liberty-themed Monopoly board game entitled "Libertyopoly." The game is being sold in stores including WALMART.  Libertyopoly includes multiple game pieces that use the JERRY FALWELL trademark in a manner that is likely to confuse consumers, including by identifying one of the pieces of "real estate" on the game board as THE JERRY FALWELL CENTER.   Liberty is selling other items, including picture frames,

mugs, drink coozies, and coasters—among other potential items expected to be identified during discovery in this litigation—that all depict the JERRY FALWELL trademark on the item of merchandise in a manner that is likely to confuse consumers.

### D.  Liberty's Infringement Is Damaging to The Falwell IP

95.     Liberty's commercial exploitation of the Falwell IP has resulted in damage to the Falwell IP, the Trust and its beneficiaries.  Not only has Liberty taken actions to confuse consumers as to its affiliation, connection, or association with, or sponsorship, endorsement, or approval by, the JERRY FALWELL brand and the Falwell Family Trust, but in doing so Liberty has damaged the immense reputational value and goodwill in the Falwell IP by associating the Falwell IP with an institution that, under its current leadership in the Executive Committee, falls well short of the high standards associated with the JERRY FALWELL brand.  Liberty's attempts to cause consumers to falsely associate the University with the JERRY FALWELL brand is damaging to the brand's reputation and goodwill because, in doing so, Liberty ties the JERRY FALWELL brand to its own standards, which are inconsistent with and inferior to the standards associated with JERRY FALWELL.

96.     For example, that Liberty has permitted members of the Board of Trustees and its Executive Committee to use University funds to benefit organizations that, upon information and belief, are controlled by Board of Trustees and Executive Committee members and/or their close associates, is directly contrary to principles upon which the JERRY FALWELL brand was built and the standards by which the JERRY FALWELL brand came to be recognized by the public. During his lifetime, Dr. Falwell was a major proponent of financial integrity in religious and educational institutions.  When financial scandals associated with other, unrelated church leaders rocked the evangelical community in the 1980s, Dr. Falwell led the way in restoring public confidence and trust, and he pushed for greater financial transparency in both religious and

educational institutions.  As he stated at the time in a televised interview, "if you have any questions about your church, your ministry, your media outreach—the television or radio program you're supporting—a university, ask for an audited financial statement, underline, audited—not internal, audited.  Number two, if you have further questions as to where is the money going that I'm giving, write a letter to the principal officer and expect an answer in detail."  And Dr. Falwell practiced what he preached.  Under his leadership, the University did not permit the kind of self-dealing transactions in which the Executive Committee now appears to be engaging.

97.     The University's treatment of the Falwell family is also inconsistent with the principles for which the JERRY FALWELL brand is known, namely, the importance of forgiveness.  As discussed above (*supra ¶¶* 36-39), when news broke that Mr. Falwell's wife had an extramarital affair, certain members of the Board of Trustees and its Executive Committee used it as an opportunity to elevate their own position in the University, and advance their own interests, by eliminating Mr. Falwell from University leadership.  Rather than embrace the Falwells after they publicly renewed their commitment to their marriage, Liberty did the opposite.  Liberty publicly claimed Mr. Falwell was a "sinner," banned Mr. and Ms. Falwell from campus (notwithstanding it is the place where Mr. Falwell's father, Dr. Falwell, is interred, and the school where their children were enrolled or worked at the time), removed photos of Mr. Falwell from campus, deleted comments supportive of the Falwells from social media, deprived him of retirement funds, and harassed Mr. Falwell by filing a meritless lawsuit against him.  Particularly in light of his years of service to Liberty, this treatment is abhorrent and totally at odds with core principles for which the JERRY FALWELL brand stands.  Indeed, Dr. Falwell was known for his capacity for forgiveness and the value he placed on doing so.  As discussed above (*supra ¶* 39), at least four high-ranking University officials (a former President, a former Provost, a former Dean,

36

and a current Executive Committee member) had, themselves, been previously involved in extramarital affairs or similar misconduct, and these individuals were forgiven and employed at Liberty after their affairs or other misconduct.  By falsely associating itself with the JERRY FALWELL brand, Liberty damages the brand's reputation and goodwill by confusing consumers to believe that JERRY FALWELL sanctions the mistreatment of the Falwell family, which is inconsistent with the standards associated with the JERRY FALWELL brand.

98.     The University's direction writ large also falls well short of the high standards associated with the JERRY FALWELL brand.  Dr. Falwell envisioned a university that would be to fundamentalist Christians what The University of Notre Dame is to Catholics.  That is, he envisioned an institution with the highest academic standards that evangelical Christians could be proud of.  Certain members of the Board of Trustees and its Executive Committee, as well as individuals otherwise in leadership at Liberty, however, are steering Liberty in a direction that is inconsistent with this high standard.  These individuals aspire to a school in the tradition of church-affiliated faith-based colleges.  For example, upon information and belief, Liberty has forced out certain faculty and staff members and vendors simply because they are associated with or perceived to be closely associated with Mr. Falwell.  Such faculty and staff include individuals with outstanding credentials and a track record of high performance, including several individuals who are African American.  Upon information and belief, certain members of the Board of Trustees and its Executive Committee have attempted to justify such decisions on the basis that faculty members refused to abstain from drinking, notwithstanding that Liberty had not enforced any rules prohibiting faculty members from drinking for decades at the direction of Dr. Falwell. Indeed, when he was alive, Dr. Falwell himself recruited individuals to Liberty's faculty despite knowing that they were not teetotalers.  By falsely associating itself with the JERRY FALWELL

brand, Liberty damages the brand's reputation and goodwill by confusing consumers to believe that JERRY FALWELL endorses academic standards that are inferior to the standards for which the JERRY FALWELL brand has come to be known, which include zero tolerance for disparate treatment of faculty on the basis of race.

**E.      Jonathan Falwell's Conflict of Interest**

99.      Mr. Falwell commenced this action on July 27, 2023 on behalf of both the Trust, for which he was, at the time, a co-trustee, and himself individually and as a beneficiary of the Trust as well as Dr. Falwell's next of kin.  Prior to doing so, Mr. Falwell consulted with his brother, Jonathan Falwell ("Jonathan"), who also a co-trustee of the Trust, during which Jonathan acknowledged he has a conflict of interest as it relates to his duties with respect to Liberty's use of the Falwell IP.  As detailed herein, Jonathan is a high ranking official, trustee, and employee of Liberty, which is infringing and damaging the Falwell IP.  During these communications, Jonathan also agreed to recuse himself from participating in Trust decisions as it relates to Liberty's use of the Falwell IP.  Accordingly, Mr. Falwell commenced suit against Liberty, including by exercising his authority as the sole nonconflicted, non-recused co-trustee of the Trust.

100.      Virginia Code § 64.2-756 permitted the Mr. Falwell to initiate this litigation in his capacity as co-trustee without Jonathan's express consent because it, *inter alia*, permits a co-trustee to "delegate[] the performance of [his] function to another trustee," as Jonathan did by agreeing to recuse himself, and, separately, permits a majority of remaining co-trustees to act for the trust where "a cotrustee is unavailable to perform duties because of absence, illness, disqualification under other law, or other temporary incapacity, and prompt action is needed to achieve the purposes of the trust or to avoid injury to the trust property."

101.      After Mr. Falwell commenced this action, however, Jonathan inexplicably reversed course and claimed his consent was needed for the action to proceed, which he now asserts the

Trust does not have.  Liberty now claims the action may not proceed as a result and that the Trust cannot defend itself from Liberty's infringement of the Falwell IP.  Upon information and belief, Liberty seeks to disrupt the Trust's ability to enforce its intellectual property rights so that Liberty may lay claim to them for itself.

102.    Mr. Falwell has since initiated an action in the Circuit Court for the City of Lynchburg, Virginia, seeking a formal disqualification of Jonathan from acting in his capacity as co-trustee as it relates to Liberty's use of the Falwell IP (the "Disqualification Action").  *See Jerry L. Falwell, Jr. v. Jonathan P. Falwell*, Case No. CL23000712-00 (Lynchburg Cir. Ct.).

103.    As detailed in the Disqualification Action, Jonathan suffers from a clear conflict of interest as it relates to Liberty's use of the Falwell IP.  As a co-trustee of the Trust, he owes fiduciary duties to the Trust and all its beneficiaries to protect and maximize the value of the Falwell IP.  He is also a high ranking official, trustee, and employee of Liberty, which is infringing and damaging the Falwell IP.  Indeed, as alleged herein, Jonathan's conflict of interest has prompted him to take actions, or fail to take actions, that constitute a breach of his fiduciary duties to the Trust.

104.    For over 30 years, Jonathan has served, and continues to serve, as a trustee on Liberty's Board of Trustees.

105.    From April 2021 through the present, Jonathan has also served as Liberty's campus pastor/chaplain.

106.    In 2010, Jerry as President of Liberty appointed Jonathan as Liberty's Vice Chancellor for Spiritual Affairs, a position he held until March 2023.

107.    In March 2023, Liberty announced that it had promoted Jonathan to Chancellor of the University, which position he continues to hold.

108.    In 2023, Jonathan also took a position on the Executive Committee of Liberty's Board of Trustees, which position he also continues to hold.

109.    The Chancellor at Liberty is a high-ranking and high-profile position.   The Chancellor is paid at least a six-figure salary and has access to numerous financial perks, including travel on the university's private jet and use of the university's vehicles.  The Chancellor also is given public notoriety through speaking at public events, as well as student, faculty and staff events and representing the university as a high ranking official in the media.

110.    Upon information and belief, Jonathan has recently accepted another financial perk of the Chancellor's position and is now in the process of moving into a home owned by Liberty on top of Liberty Mountain overlooking the campus.  Upon information and belief, at Jonathan's request, Liberty is also paying for the construction of a swimming pool on the property for the use of Jonathan and his family.

111.    In addition, five of Jonathan's family members, including children and spouses of children, have recently become employed by Liberty in various roles.

112.    Upon information and belief, Jonathan expects to receive income from Liberty for the rest of his life, *i.e.*, from a salary until such time he retires, followed by retirement income.

113.    Jonathan's continuing duties to Liberty University as trustee, employee, Executive Committee member, and Chancellor are in direct financial conflict with his duties owed to the Trust and all its beneficiaries.  His relationship with Liberty—for which he is not only an employee and high-ranking official, but a ***trustee***—standing alone, is enough to demonstrate that he is unable to act with complete loyalty to the Trust's financial interests as it relates to Liberty's use of the Trust IP.

114. However, Jonathan's conflict of interest does not stop there. Jonathan's relationship with Thomas Road Baptist Church ("TRBC") also gives rise to a conflict of interest. Jonathan serves as senior pastor of TRBC, a role he has held since Dr. Falwell's passing in 2007.

115. Through his relationship to TRBC, Jonathan is beholden to Liberty's interests in additional ways. For example, on three separate occasions between 2007 when Jonathan became senior pastor of TRBC and August 2020, Liberty paid millions of dollars to rescue TRBC from financial ruin. Liberty did so by purchasing real property from TRBC in amounts ultimately totaling tens of millions of dollars, in order to keep TRBC solvent.

116. Upon information and belief, TRBC is still unable to meet its financial needs (e.g., to cover maintenance, janitorial and security staff), and Liberty provides about $1 million in services to TRBC annually, recorded as donations by Liberty.

117. Upon information and belief, Liberty and Jonathan have colluded to avoid publicly reporting additional income that Jonathan receives from Liberty, whether directly or indirectly, in the form of contributions to TRBC. As a church, TRBC is not required to publicly report its finances. The University, however, is, and yet Liberty has not publicly reported income that Jonathan receives from TRBC notwithstanding that Liberty is essentially funding TRBC, and notwithstanding that, since 2020, the University has amended its rules to permit TRBC to exercise some level of control over the composition of the Board of Trustees. Upon information and belief, Jonathan and Liberty's actions to conceal his income give rise to yet further conflicts of interest.

118. After this lawsuit was commenced, Jonathan wrote and provided to Liberty a letter he addressed to Tim Lee (of the Executive Committee and Board Chairman) on or around August 3, 2023, asserting "the Jerry Falwell Family Trust has not received Jonathan's consent or approval as co-trustee (and as a beneficiary) of the Jerry Falwell Family Trust, or Jeannie's consent as a

beneficiary of the Trust, either to retain counsel or file the lawsuit on behalf of the Trust."  By making this assertion, Jonathan disregarded the recusal he had already agreed to in communications with Jerry, and betrayed the Trust by seeking to undermine or frustrate Jerry's ability to prosecute this action on behalf of the Trust.

119.   Jonathan further betrayed the interests of the Trust and its beneficiaries by asserting his purported belief that Liberty has the right to use the Falwell IP "for any purposes necessary to further the original mission of LU" (a belief he failed to substantiate by reference to any license). In fact, Dr. Falwell during his lifetime was very protective of the Falwell IP and never granted Liberty any license to make general use of the Falwell IP in any manner Liberty saw fit, nor did the Trust ever do so after Dr. Falwell's passing.  But by making this groundless assertion, Jonathan purported to offer support to Liberty's unauthorized acts of infringement, in violation of his duties to the Trust.

120.   Jonathan now refuses to give his consent to prosecute a trademark infringement action on behalf of the Trust and improperly refuses to take action to protect the Falwell IP from Liberty's infringement or to seek damages from Liberty for its infringement, which would otherwise benefit the Trust and its beneficiaries, including Plaintiff.  On the contrary, Jonathan has offered support to Liberty, to whom he is beholden by virtue of his position there and his conflict of interest, in further disregard of his duties to the Trust.   Upon information and belief, in furtherance of his apparent intention to use his position as co-trustee to take actions that benefit himself personally over the Trust, on or around September 6, 2023, Jonathan obtained the concurrence of Jeannie, who is a beneficiary of the Trust with Jerry and Jonathan (and upon information and belief, who was not represented or advised by counsel), to remove Jerry as co-trustee.

## COUNT ONE:  FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114(1) (Section 32(1) of the Lanham Act)
### (Against Defendants Liberty and Prevo)

121.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 120 with the same force and effect as if fully stated herein.

122.    The Falwell Family Trust owns an incontestable trademark registration, Reg. No. 3039870, for the JERRY FALWELL trademark.

123.    Liberty has both actual and constructive knowledge of Falwell Family Trust's federally registered JERRY FALWELL trademark.

124.    Liberty has used, is using, and, upon information and belief, will continue to use the Falwell Family Trust's federally registered JERRY FALWELL trademark, and marks confusing similar thereto, in connection with the advertising, promotion, and sale of its goods and services including, without limitation, the JERRY FALWELL CENTER, without the Falwell Family Trust's authorization.

125.    Liberty's unauthorized use of the JERRY FALWELL trademark, and marks confusingly similar thereto, has caused and is likely to cause confusion, mistake, and deception as to the affiliation, connection, or association with, or sponsorship, endorsement, or approval by, the Falwell Family Trust and the JERRY FALWELL brand, in violation of 15 U.S.C. § 1114.

126.    Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademark.

127.    Prevo and Liberty's unlawful conduct was and is knowing, deliberate, willful, and in bad faith and done with the intent to trade on the goodwill and reputation of the Falwell Family Trust and its federally registered JERRY FALWELL trademark and to deceive consumers into

believing that Defendants' goods and services were affiliated, connected, or associated with, or sponsored, endorsed, or approved by, Falwell Family Trust and the JERRY FALWELL brand.

128.    As a result of Prevo and Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment.

129.    Unless Prevo and Liberty are enjoined from their unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable harm for which they have no adequate remedy at law.

### COUNT TWO:  FEDERAL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN

15 U.S.C. § 1125(a)(1)(A) (Section 43(a)(1)(A) of the Lanham Act)
(Against Defendants Liberty and Prevo)

130.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 129 with the same force and effect as if fully stated herein.

131.    The Falwell Family Trust owns distinctive marks for JERRY FALWELL for a variety of goods and services.

132.    Liberty has both actual and constructive knowledge of Falwell Family Trust's superior rights in the JERRY FALWELL marks.

133.    Liberty has used, is using, and, upon information and belief, will continue to use the Falwell Family Trust's JERRY FALWELL trademarks, and marks confusing similar thereto, in connection with the advertising, promotion, and sale of its goods and services, including, without limitation, the JERRY FALWELL CENTER without the Falwell Family Trust's authorization.

134.    Liberty's unauthorized use of the JERRY FALWELL trademarks, and marks confusingly similar thereto, has caused and is likely to cause confusion, mistake, and deception as to the affiliation, connection, or association with, or sponsorship, endorsement, or approval by, the Falwell Family Trust and the JERRY FALWELL brand, in violation of 15 U.S.C. § 1125.

135.    Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademarks.

136.    Prevo and Liberty's unlawful conduct was and is knowing, deliberate, willful, and in bad faith and done with the intent to trade on the goodwill and reputation of the Falwell Family Trust and its federally registered JERRY FALWELL trademark and to deceive consumers into believing that Defendants' goods and services were affiliated, connected, or associated with, or sponsored, endorsed, or approved by, Falwell Family Trust and the JERRY FALWELL brand.

137.    As a result of Prevo and Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment.

138.    Unless Prevo and Liberty are enjoined from their unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable harm for which they have no adequate remedy at law.

## COUNT THREE: FALSE ADVERTISING
### 15 U.S.C. § 1125(a)(1)(B) (Section 43(a)(1)(B) of the Lanham Act)
### (Against Defendants Liberty and Prevo)

139.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 138 with the same force and effect as if fully stated herein.

140.    Liberty is distributing and has distributed advertising and promotional materials that contain statements that cause consumers to wrongly believe that Liberty's use of the JERRY

FALWELL trademarks, and marks confusingly similar thereto, is authorized, licensed, endorsed or sponsored by, or otherwise affiliated, associated, or connected with the Falwell Family Trust and the JERRY FALWELL brand, when in fact it is not.

141.    Liberty's false or misleading statements misrepresent the nature, characteristics, and qualities of Liberty's goods, services, or commercial activities, including, without limitation, the JERRY FALWELL CENTER, and have deceived and are likely to deceive the public and the trade in violation of 15 U.S.C. § 1125.

142.    Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademarks and the distribution of the aforementioned false and misleading statements.

143.    Prevo and Liberty's unlawful conduct was and is knowing, willful, deliberate, and in bad faith because Prevo and Liberty knew at the time the statements were made that they were false or misleading statements and made the statements in order to increase the sales of Liberty's goods or services.

144.    As a result of Prevo and Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment.

145.    Unless Prevo and Liberty are permanently enjoined from their unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable injury for which it has no adequate remedy at law.

## COUNT FOUR:  UNAUTHORIZED USE OF NAME, PORTRAIT, OR PICTURE
Va. Code Ann. § 8.01-40
(Against Defendants Liberty and Prevo)

146.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 145 with the same force and effect as if fully stated herein.

147.   Liberty has used, is using, and, upon information and belief, will continue to use the name, portrait, and/or picture of Dr. Falwell, and the name of Plaintiff Mr. Falwell, without the required written consent and for advertising purposes and/or for the purposes of trade.

148.   Liberty's use of Dr. Falwell's name, portrait, and/or picture, and Mr. Falwell's name, without the required written consent and for advertising purposes and/or for the purposes of trade, has caused damage and irreparable injury to Plaintiff and the Trust and its beneficiaries.

149.   Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the name, portrait, and/or picture of Dr. Falwell, and the name of Plaintiff Mr. Falwell, without the required written consent and for advertising purposes and/or for the purposes of trade.

150.   Prevo and Liberty have knowingly used Dr. Falwell's name, portrait, and/or picture, and Mr. Falwell's name, in such manner as is forbidden or declared to be unlawful by Va. Code Ann. § 8.01-40, and is therefore liable for exemplary and punitive damages.

## COUNT FIVE:  TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN UNDER VIRGINIA LAW
(Against Defendants Liberty and Prevo)

151.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 150 with the same force and effect as if fully stated herein.

152.   The Falwell Family Trust owns distinctive trademarks for JERRY FALWELL for a variety of goods and services.

153.    Liberty has both actual and constructive knowledge of Falwell Family Trust's superior rights in the JERRY FALWELL marks.

154.    Liberty has used, is using, and, upon information and belief, will continue to use the Falwell Family Trust's JERRY FALWELL trademarks, and marks confusing similar thereto, in connection with the advertising, promotion, and sale of its goods and services, including, without limitation, the JERRY FALWELL CENTER, without the Falwell Family Trust's authorization.

155.    Liberty's unauthorized use of the JERRY FALWELL trademarks has caused and is likely to cause confusion, mistake, and deception as to the affiliation, connection, or association with, or sponsorship, endorsement, or approval by, the Falwell Family Trust and the JERRY FALWELL brand, in violation of Virginia law.

156.    Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademarks.

157.    Prevo and Liberty's unlawful conduct was and is knowing, deliberate, willful, and in bad faith and done with the intent to trade on the goodwill and reputation of the Falwell Family Trust and its JERRY FALWELL trademark and to deceive consumers into believing that the Falwell Family Trust and the JERRY FALWELL brand was connected with Defendants' goods and services.

158.    As a result of Prevo and Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment.

159.     Unless Prevo and Liberty are enjoined from their unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable harm for which they have no adequate remedy at law.

## COUNT SIX: FALSE ADVERTISING AND UNFAIR COMPETITION UNDER VIRGINIA LAW
### (Against Defendants Liberty and Prevo)

160.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 159 with the same force and effect as if fully stated herein.

161.     Liberty is distributing and has distributed advertising and promotional materials that contain statements that cause consumers to wrongly believe that Liberty's use of the JERRY FALWELL trademark, and marks confusingly similar thereto, is authorized, licensed, endorsed or sponsored by, or otherwise affiliated, associated, or connected with the Falwell Family Trust, when in fact it is not.  Accordingly, Liberty's advertising and promotional materials misrepresent its goods or services as those of another; misrepresent the source, sponsorship, or approval of goods or services, misrepresent the affiliation, connection, or association of the supplier, or of the goods or services, with another; and misrepresents that goods or services have certain characteristics; in violation of Virginia law.  *See* VA Code Ann. § 18.2-216.

162.     Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademark and the distribution of the aforementioned false and misleading statements.

163.     Prevo and Liberty's unlawful conduct was and is knowing, willful, deliberate, and in bad faith because Prevo and Liberty knew at the time the statements were made that they were false or misleading statements and made the statements in order to increase the sales of Liberty's goods or services.

164.     As a result of Prevo and Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment. Unless Prevo and Liberty is are permanently enjoined from their unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable injury for which it has no adequate remedy at law.

## COUNT SEVEN: ANTICYBERSQUATTTING CONSUMER PROTECTION ACT
### 15 U.S.C. § 1125(d)
### (Against Defendants Liberty and Prevo)

165.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 164 with the same force and effect.

166.     The Falwell Family Trust owns the distinctive JERRY FALWELL trademarks.

167.     The Falwell Family Trust owns an incontestable trademark registration, Reg. No. 3039870, for the JERRY FALWELL trademark.

168.     Liberty and Prevo have both actual and constructive knowledge of Falwell Family Trust's JERRY FALWELL trademarks.

169.     Liberty has, upon information and belief, a bad faith intent to profit from the JERRY FALWELL trademarks.

170.     Liberty has registered, trafficked in, and used, and is continuing to maintain the registration of, traffic in, and use, the domain name JERRYFALWELLCENTER.COM, which is identical or confusingly similar to the JERRY FALWELL trademarks.

171.     Defendant Prevo directed, authorized, and/or participated in Liberty's unauthorized use of the JERRY FALWELL trademarks, including, upon information and belief, the decision to register, traffic in, and use the domain name JERRYFALWELLCENTER.COM

172.     As a result of Liberty's unlawful conduct, the Trust, its beneficiaries, and Plaintiff have suffered and are likely to suffer damages, and Liberty has obtained profits and/or unjust enrichment.

173.     Unless Liberty is enjoined from its unlawful conduct, the Trust, its beneficiaries, and Plaintiff will continue to suffer irreparable harm for which they have no adequate remedy at law.

## COUNT EIGHT: BREACH OF FIDUCIARY DUTY
### (Against Defendant Jonathan Falwell)

174.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 173 with the same force and effect.

175.     As a trustee of the Trust, Jonathan owes the Trust various duties, including, among others, a duty to administer the trust solely in the interests of the beneficiaries, a duty to take reasonable steps to protect property of the trust, and a duty to refrain from acting in his personal interest at the expense of the interest of the Trust's beneficiaries.

176.     Jonathan's actions in seeking to frustrate the ability of the Trust to protect the Falwell IP from infringement by Liberty and to pursue legal remedies and damages for past infringement, as well as his failure to take or join in legal action against Liberty, constitute breaches of his fiduciary duties to the Trust.

177.     Jonathan's breaches of his fiduciary duties to the Trust has resulted in injury to and damaged Plaintiff Mr. Falwell as well as the Trust and its beneficiaries.

## PRAYER FOR RELIEF

178.     WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully request this Honorable Court:

a)      Enter judgment in Plaintiff's favor against Defendants on all claims for relief alleged herein;

b)      Issue a permanent injunction that:

1.   Enjoins Defendants Prevo and Liberty, and Liberty's employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with it or having knowledge of its use of the JERRY FALWELL marks and the Jerry Falwell name, portrait, or picture, from using Dr. Falwell's name, portrait, or picture in advertising or for purposes of trade, and from using any of the JERRY FALWELL trademarks, alone or in combination with any word(s), name(s), term(s), designation(s), marks(s), or design(s), as well as any mark, image, or depiction that is confusingly similar to or likely to impair the distinctiveness of the JERRY FALWELL marks;

2.   Enjoins Prevo and Liberty, and Liberty's employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with them or having knowledge of the causes of action from making false or misleading statements concerning the JERRY FALWELL marks and Defendant's use thereof, whether Defendant's use of the JERRY FALWELL marks is licensed, sponsored, endorsed or approved by, or otherwise associated, affiliated, or connected with the JERRY FALWELL brand and the Falwell Family Trust; and, in the sale,

advertising, or promotion of their goods and services, from using the JERRY FALWELL marks, alone or in combination with any word(s), term(s), designation(s), marks(s), or design(s), as well as any mark, image, or depiction that is confusingly similar or likely to impair the JERRY FALWELL marks;

3. Requires Defendants Prevo and Liberty, and Liberty's employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with it or having knowledge of the causes of action to engage in corrective advertising in a form pre-approved by the Trust and the Court to dispel the confusion caused by Defendant's unlawful conduct; and

4. Requires Defendants Prevo and Liberty to file with the Court and serve on Plaintiff, within thirty (30) days after entry of an injunction, a report in writing under oath setting forth in detail the manner in which they have complied with the Court's injunction.

5. Requires Defendant Liberty to transfer the infringing JERRYFALWELLCENTER.COM domain to the Trust.

c) Grant monetary relief in the form of:

1. Compensatory damages and disgorgement of Liberty's profits under 15 U.S.C. § 1117 and Virginia law for all injuries caused by Defendant's acts alleged herein;

2. An accounting of Liberty's profits derived by its acts alleged herein under 15 U.S.C. § 1117 and Virginia law and said accounting trebled;

3. Statutory damages, if elected by Plaintiff at the appropriate time;

4. Punitive damages under Virginia law;

5. Enhanced or treble damages under 15 U.S.C. § 1117 and Virginia law;

6. Attorneys' fees and costs under 15 U.S.C. § 1117 and Virginia law;

7. Prejudgment and post judgment interest; and

8. Such other and further relief which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

Dated:  September 13, 2023

/s/ *Robert N. Drewry*
Counsel

Vernon E. Inge, Jr (VSB No. 32699)
Robert N. Drewry (VSB No. 91282)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    (804) 977-3300
Facsimile:    (804) 977-3299
E-Mail:    vinge@whitefordlaw.com
E-Mail:    rdrewry@whitefordlaw.com

*Counsel for Plaintiff, Jerry L. Falwell, Jr,*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of September 2023, I electronically filed the foregoing *Amended Complaint* with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ *Robert N. Drewry*

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     (804) 977-3300
Facsimile:     (804) 977-3299
E-Mail:         vinge@whitefordlaw.com
E-Mail:         rdrewry@whitefordlaw.com

*Counsel for Plaintiff, Jerry L. Falwell, Jr.*